IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LESLIE S. BOSICK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 20-1119 (MN) |
| ) | |
| KILOLO KIJAKAZI, Acting Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

Leslie S. Bosick, Pro Se Plaintiff

David C. Weiss, United States Attorney, Heather Benderson, Special Assistant United States Attorney, District of Delaware, Office of the General Counsel, Social Security Administration, Philadelphia, PA; Brian C. O'Donnell, Regional Chief Counsel, Allison L. Granger, Assistant Regional Counsel, Social Security Administration, Philadelphia, PA – Attorneys for Defendant

January 11, 2022
Wilmington, Delaware

**NOREIKA, U.S. DISTRICT JUDGE:**

Presently before the Court are the objections (D.I. 20) of Plaintiff Leslie S. Bosick ("Plaintiff") to Magistrate Judge Fallon's October 15, 2021 Report and Recommendation (D.I. 19) ("the Report"). The Report recommended (1) denying Plaintiff's motion for summary judgment (D.I. 13) and (2) granting Defendant's cross-motion for summary judgment (D.I. 14). The Court has reviewed the Report (D.I. 19), Plaintiff's objections (D.I. 20) and Defendant's response thereto (D.I. 23), and the Court has considered *de novo* the objected-to portions of the Report, the relevant portions of the motions, and supporting documentation (D.I. 13, 14, 15, 18). For the reasons set forth below, Plaintiff's objections are OVERRULED, the Report is ADOPTED, Plaintiff's motion for summary judgment (D.I. 13) is DENIED, and Defendant's cross-motion for summary judgment (D.I. 14) is GRANTED.

**I.     BACKGROUND**

The Report sets forth a detailed description of the procedural history, medical history, and the proceeding before the Administrative Law Judge. (*See* D.I. 19 at 2-12). The parties have not objected to any of those sections of the Report and the Court finds no error in those sections. The Court therefore adopts those sections and incorporates them here:

**A.     Procedural History**

Bosick protectively filed a DIB application on February 8, 2017, alleging a disability onset date of June 14, 2013 due to knee injuries. (D.I. 10 at 144-49)  Bosick's claims were denied initially in March 2017 and again on reconsideration in June 2017. (*Id.* at 74, 85)  At Bosick's request, an administrative law judge ("ALJ") held a hearing on May 6, 2019. (*Id.* at 35-61)  The ALJ issued an unfavorable decision on May 21, 2019, finding that Bosick was not disabled under the Act because she could perform a reduced range of sedentary work. (*Id.* at 23-27)  The Appeals Council subsequently denied Bosick's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 7-9)

Bosick brought this civil action challenging the ALJ's decision on August 26, 2020. (D.I. 1) Bosick filed her pending motion for summary judgment on May 19, 2021 (D.I. 13), and the Commissioner cross-moved for summary judgment on June 11, 2021 (D.I. 14). Briefing is now complete.

**B.     Medical History**

Bosick was 46 years old on December 31, 2013, her date last insured. (D.I. 10 at 26, 62) Bosick has a college degree and has past relevant work as a customer service representative, an elementary school teacher, and a substitute teacher. (*Id.* at 43-44) The ALJ found that Bosick had the following severe impairments: bilateral knee disorder, obesity, and sleep apnea. (*Id.* at 21) Bosick challenges the ALJ's consideration of her knee condition, the weight given to the opinions of non-examining agency physicians, and the assessment of her subjective complaints of pain. (D.I. 13; D.I. 18) Because Bosick does not challenge the ALJ's decision regarding her obesity and sleep apnea, the court does not address those conditions here.

   **1.     Medical evidence**

On June 14, 2013, Bosick tripped on uneven flooring and fell while she was shopping, sustaining injuries to her knees. (D.I. 10 at 44; D.I. 11 at 66) Ten days later, Bosick treated with Michael Axe, M.D., an orthopedic surgeon, for bilateral knee pain. (D.I. 11 at 66-67) Dr. Axe noted that Bosick's pain increased with bending, climbing stairs, movement, sitting, walking, and standing, and she experienced decreased mobility, limping, numbness, spasms, swelling, tingling, bruising, and weakness in her legs. (*Id.* at 66) An x-ray revealed post-ACL reconstruction in her left knee with anteromedial changes, and her right knee showed degeneration of the medial compartment following ACL reconstruction. (*Id.* at 66, 111-14) Dr. Axe indicated there was no effusion. (*Id.* at 66) He explained that she could perform activities as tolerated, and he ordered MRIs of both knees. (*Id.* at 66-67) Dr. Axe prescribed a topical gel and medication for the pain, and he suggested that they discuss bracing her legs after receiving her MRI results. (*Id.* at 67)

On July 1, 2013, Bosick visited Dr. Axe to review her MRI results, which showed mild partial tearing of her right ACL, a right lateral meniscus tear, and loss of medial and patellofemoral components indicative of degenerative arthritis with a partial radial tear of the medial meniscus in her left knee. (D.I. 11 at 68, 733-34) Dr. Axe diagnosed Bosick with a meniscus tear and degenerative

arthritis of the knee, including cartilage loss under her left kneecap. (*Id.*) He discussed the possibility of an arthroscopic debridement and possible lateral release of the left knee and addressed the cartilage loss and possible meniscus tear in her right knee. (*Id.*) Dr. Axe represented that Bosick would be "totally disabled for the next 2 weeks" and recommended pool and land therapy, with the goal of improving her range of motion and strength. (*Id.*)

Bosick began physical therapy on July 2, 2013 to treat her bilateral knee pain, increase her strength and range of motion, and improve her gait. (D.I. 11 at 317) Physical therapy progress notes from July 2013 indicate that Bosick benefited from the use of the knee brace, but she still experienced pain and swelling in her left knee. (D.I. 11 at 302) Aquatic therapy helped her gain strength without pain, and her topical pain cream was effective. (*Id.*) Bosick's range of motion and strength improved bilaterally, but her gait remained abnormal. (*Id.*) She reported difficulty standing from a seated position, climbing stairs, repetitive standing, and walking. (*Id.*)

In mid-July 2013, Dr. Axe gave Bosick a lidocaine injection in her left knee and prescribed the use of a knee immobilizer so she would have "the ability to walk with a straight leg." (*Id.* at 69) At the end of July, Dr. Axe noted improvement with therapy and a home stimulation unit, and he observed that she had no effusion. (*Id.* at 70) Dr. Axe recommended reducing their visits from biweekly to once a month, and he reduced her use of the home stimulation unit from three times a day to twice a day. (*Id.*) At Bosick's visit in August 2013, Dr. Axe noted tears in both menisci of Bosick's left knee and recommended surgical intervention to release the ligament and repair the meniscus. (*Id.* at 71) Dr. Axe indicated that Bosick had been in the knee immobilizer for too long and she felt that she was dependent on it. (*Id.*)

On September 12, 2013, Bosick underwent surgery on her left knee for a torn meniscus. The surgery included a partial synovectomy with lysis of adhesions, a partial medial meniscectomy, chondroplasty, and lateral release. (D.I. 11 at 115-16) The following week, Dr. Axe noted that, although Bosick experienced intermittent pain, she was responding to medication and her status had improved post-surgery. (*Id.* at 73) He performed two aspirations on her left knee following her surgery in September 2013. (*Id.* at 73, 75) Dr. Axe indicated that Bosick was to be considered "totally disabled" until her return visit in three weeks. (*Id.* at 75, 106-07)

3

In October 2013, Dr. Axe noted that Bosick was "tracking better," had "less effusion," and was "progressing nicely" at physical therapy. (D.I. 11 at 76) Bosick used crutches, but Dr. Axe indicated that the physical therapist could switch her to a cane at any point. (*Id.*) Bosick was prescribed Percocet and Voltaren gel to manage her pain. (*Id.*) Dr. Axe emphasized a focus on improving Bosick's strength before she returned to work. (*Id.*) Physical therapy notes from October 2013 indicate that Bosick made progress and felt better after her sessions, and she exhibited improved walking, improved tolerance for activities of daily living, and increased ability to stand. (*Id.* at 279-86)

In November 2013, Dr. Axe indicated that Bosick was able to go back to work at a "desk-type" position that would not require kneeling, squatting, or crawling. (D.I. 11 at 77) Dr. Axe observed that Bosick could perform a straight leg raise, and he reported that she continued to attend physical therapy and take Percocet and Voltaren. (*Id.*) During physical therapy that month, Bosick's progress report indicated that she was "making good progress towards [a] return to full function," and despite a continued deficit in knee flexion, she exhibited an improved range of motion and strength. (*Id.* at 272) She was able to use a cane instead of crutches to ambulate at home, and her gait improved after she was fitted for a brace. (*Id.* at 268-72)

On December 11 and 27, 2013, Bosick received injections of lidocaine, Kenalog, and Supartz for pain, and Dr. Axe suggested that her discomfort would improve as she regained her strength. (D.I. 11 at 78, 80) Dr. Axe indicated that Bosick could perform activities as tolerated. (*Id.* at 80) Bosick mostly reported feeling better during her physical therapy sessions after receiving the injections, and she indicated that she had stopped using her cane at home. (*Id.* at 257-62) The physical therapist noted improved movement in her patella. (*Id.* at 257)

Bosick continued to treat with Dr. Axe in 2014, following her date last insured. She received multiple bilateral knee injections of Supartz in January 2014. (D.I. 11 at 81-84) Bosick returned to Dr. Axe in March 2014, complaining of occasional bilateral knee pain that was worse on the left side. (*Id.* at 85-86) Dr. Axe reviewed x-rays that revealed degenerative arthritis. (*Id.*) He recommended treating the pain with medication and suggested that she might require a knee replacement in the future. (*Id.* at 86) By April 2014, Bosick described her pain as constant, aching, sharp, and throbbing. (*Id.* at 87) However, Dr. Axe suggested that Bosick had "turned the corner" with her current treatment of X2 cream and Meloxicam

because it allowed her to focus on getting her strength back which, in turn, would increase her functionality. (*Id.*) He indicated that her need for a cane was up for debate, and she "certainly can return . . . to work in which she has a desk job." (*Id.* at 87, 105) In June 2014, Dr. Axe reported that Bosick continued to get better and had shown 50% improvement despite a 40.8 deficit in peak torque, down from a deficit of 49.1 in September 2013, and he anticipated that she would improve further with continued treatment. (*Id.* at 88, 746-47) He prescribed five weeks of Supartz injections and renewed her prescription for Meloxicam. (*Id.* at 89)

Bosick was discharged from physical therapy on July 18, 2014. (D.I. 11 at 203) During her treatment in June and July 2014, Bosick reported feeling better, she had an easier time performing activities of daily living, and she exhibited improved strength and walking. (*Id.* at 205-12) Although she performed a mix of land and aquatic therapy exercises between January and May 2014, her treatment no longer included aquatic exercises by June 2014. (*Id.* at 205-06)

Bosick completed her Supartz injections in September 2014, about a year after her surgery. (D.I. 11 at 95) She complained of aching, burning pain in both knees, but she did acknowledge some improvement from the injections. (*Id.*) There are no further records from Dr. Axe's office until March 2016, when Bosick presented with bilateral knee pain and swelling, and x-rays revealed end-stage osteoarthritis in both knees. (*Id.* at 97) Bosick underwent a total knee replacement of her left knee on April 22, 2016. (*Id.* at 99, 117-18) Her physical therapy discharge notes from October 2016 indicate that Bosick had "made objective improvements with Strength, as well as shown improvements with Gait, Weight Bearing." (*Id.* at 135)

    2.    **Medical opinions**

During the course of his treatment of Bosick, Dr. Axe periodically opined on her capacity to work. Dr. Axe represented that Bosick was unable to work from July 2013 through the period following her September 2013 surgery. (D.I. 11 at 107-10) On October 21, 2013, Dr. Axe opined that Bosick was "totally disabled" and could do "no work" until her next office visit. (*Id.* at 106) The following month, Dr. Axe suggested that Bosick could not return to previous work that involved kneeling, squatting, or crawling, but he recommended that she consult with an employment counselor to find appropriate work given her age. (*Id.* at 77) In April 2014, Dr. Axe explained that Bosick could not squat, climb, crawl, or stoop,

5

and could not stand or walk for more than ten minutes per hour, but he cleared her for desk duty. (*Id.* at 105)

Dr. Michael H. Borek, D.O., a state agency physician, reviewed Bosick's medical records and performed a residual functional capacity analysis based on those written records on March 13, 2017. (D.I. 10 at 62-72) Dr. Borek found Bosick's statements regarding her symptoms to be partially consistent with the objective medical evidence, but he noted that surgery and physical therapy resulted in improvement to Bosick's knee pain and her ability to perform activities of daily living. (*Id.* at 67) He opined that she was restricted to occasionally and frequently lifting and carrying ten pounds, standing and walking for two hours in an eight-hour workday, and sitting for a total of six hours, among additional restrictions in her lower extremities. (*Id.* at 68) As a result, Dr. Borek opined that Bosick was not disabled and was restricted to sedentary work. (*Id.* at 71)

State agency physician Darrin Campo, M.D. evaluated Bosick's written medical records at the reconsideration level on June 6, 2017. (D.I. 10 at 75-84) On appeal, Bosick indicated that she had greater difficulty walking, increased pain and deterioration in her right knee, and limping on her right side. (*Id.* at 80) Dr. Campo confirmed that Bosick exhibited an antalgic gait and limited range of motion that improved after undergoing arthroscopic surgery for a meniscal tear. (*Id.*) Dr. Campo opined that Bosick otherwise exhibited normal lower extremity strength and sensation, and subsequent medical evidence fell outside the period of adjudication. (*Id.*) Consequently, Dr. Campo adopted the initial determination regarding Bosick's claim and concluded that she was not disabled. (*Id.* at 80, 83)

### 3. Nonmedical evidence

On February 24, 2017, Bosick completed a function report. (D.I. 10 at 211-18) In the report, she described how fatigue, pain, and discomfort prevent her from working because these symptoms limit her ability to sit, stand, walk, and concentrate. (*Id.* at 211) Bosick reported that she spends her days going to physical therapy, doing exercises, and elevating and icing her leg in addition to watching television and attending to her personal hygiene. (*Id.* at 212) Although she indicated that she could dress and bathe herself, she said that these tasks are difficult and painful, and she does them less frequently. (*Id.*) She explained that she can no longer climb stairs, do housework, or walk, stand, or sit for long periods. (*Id.*) Her pain interfered with her ability to sleep. (*Id.*) Bosick reported

that she is able to prepare her own meals and drive a car, but she can only walk a few feet without the assistance of a cane. (D.I. 10 at 213-14, 216-17)

### C. Hearing Before the ALJ

At the administrative hearing on May 6, 2019, Bosick represented herself. (D.I. 10 at 37) The ALJ carefully explained Bosick's rights and offered to postpone the hearing should Bosick wish to seek representation. (*Id.* at 37-38) Specifically, the ALJ explained that "[a] representative could help you obtain information about your claim, explain medical terms, help protect your rights and make any request or give any notice about the proceeding before me." (*Id.*) Bosick was advised that some organizations offer legal representation free of charge. (*Id.* at 37) Bosick was further advised that, if her claim was ultimately denied, she could appeal it on her own or with a representative, and she could file a new application on her own or with a representative. (*Id.* at 39) Bosick confirmed that she understood and agreed to proceed without counsel.[1] (*Id.*)

#### 1. Bosick's Testimony

Upon questioning by the ALJ, Bosick testified that she lives by herself, she drives a car, and she has a college degree. (D.I. 10 at 43) She previously worked as a customer service representative, an elementary school teacher, and a substitute teacher. (*Id.* at 43-44) She stopped working in 2013 after falling and injuring her knees. (*Id.* at 44-45) Bosick explained that she suffered from degenerative arthritis in her knees before the fall, and she underwent surgery three months after the fall. (*Id.* at 45) She stated that she lost the muscle in her left leg during the time between her fall and

---

[1] In her brief, Bosick states, "I do not have a lawyer. This is one of the reasons that I feel discriminated against in this case." (D.I. 13 at 2) The ALJ has a heightened level of care and responsibility to assume a more active role when the claimant is unrepresented. *Dobrowolsky v. Califano*, 606 F.2d 403 (3d Cir. 1979). The ALJ did so here, informing Bosick that, "[b]ecause you are not represented, I'll make sure that your due process rights are protected and obtain any evidence that may be needed." (D.I. 10 at 39) The ALJ is not required to act as the claimant's counsel, and "[l]ack of counsel alone is not sufficient for remand." *Conley v. Colvin*, C.A. No. 15-722-RGA-MPT, 2016 WL 3436435, at *10 (D. Del. June 20, 2016) (citing *Domozik v. Cohen*, 413 F.2d 5, 9 (3d Cir. 1969)). Here, the ALJ added new evidence presented by Bosick to her file and elicited testimony from Bosick, Bosick's mother, and the VE regarding Bosick's impairments, the extent of those impairments on her ability to work, and her medical treatment. (D.I. 10 at 39-60) On these facts, the ALJ fulfilled his duty to develop the record and provide a full and fair administrative hearing for Bosick.

her surgery, and she could not sleep because of the severity of the pain. (*Id.*) She tried returning to work in 2015 and 2016, but she only did occasional substitute teaching due to the swelling and pain in her legs. (*Id.* at 45-46) She described having difficulty going up and down stairs, walking, sitting for long periods, standing, turning, getting in and out of a car, and sleeping. (*Id.* at 49)

Bosick's mother, Ms. Caldwell, also testified at the hearing before the ALJ. Ms. Caldwell said she visited her daughter a couple times a month throughout the relevant time period and described Bosick's pain as unrelenting. (*Id.* at 52) She represented that Bosick suffered pain from sitting in a chair, standing, walking, climbing stairs, and getting in and out of the shower, and she had seen no improvement over the course of the relevant time period. (*Id.* at 53) Ms. Caldwell testified that she helped her daughter financially, emotionally, and spiritually during the relevant time period, recommending medications and buying things for Bosick to make her more comfortable. (*Id.*)

### 2. Vocational Expert Testimony Before the ALJ

At the administrative hearing in May 2019, the ALJ posed the following hypothetical to vocational expert Lanell Hall ("the VE"):

> Please assume a hypothetical individual of the Claimant's age and education with the past jobs that you described. Further assume that this individual is limited to a range of sedentary work. The individual would require the use of an assistive device for ambulation, but would retain the use of the free hand for lifting and carrying. The individual would be limited to occasional use of foot controls, no climbing of ropes, ladders, or scaffolds, no kneeling or crawling. The individual would be limited to occasional climbing of ramps and stairs, occasional balancing, stooping and crouching and limited to occasional exposure to unprotected heights, moving mechanical parts, extreme temperatures, humidity and vibration.

(D.I. 10 at 55-56) In response to the ALJ's hypothetical, the VE testified that such a hypothetical individual would be able to perform Bosick's past work as a customer complaint clerk. (*Id.* at 56) The VE further testified that the hypothetical individual could

8

perform the sedentary, unskilled jobs of order clerk, document preparer, and touch-up screener. (*Id.*)

The ALJ asked the VE if an employer for the customer complaint clerk position would tolerate an employee being off task due to pain. (*Id.* at 56-57) The VE responded that, if the hypothetical individual were off task 10% or more of the day, it would preclude Bosick's past work as a customer complaint clerk and would also preclude the unskilled, sedentary positions identified. (*Id.* at 57) The ALJ also inquired about employer tolerance for someone being absent from the workplace. (*Id.* at 59-60) The VE responded that, if a person is absent more than one day a month or more than eight times per year, it would preclude all work. (*Id.* at 60)

### D. The ALJ's Findings

Based on the factual evidence in the record and the testimony by Bosick and the VE, the ALJ determined that Bosick was not disabled under the Act for the relevant time period from the June 14, 2013 disability onset date through the December 31, 2013 date last insured. (D.I. 10 at 27) The ALJ found, in pertinent part:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2013.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of June 14, 2013 through her date last insured of December 31, 2013 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: bilateral knee disorder; obesity; and sleep apnea (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

9

> 5. After careful consideration of the entire record . . ., through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except that she: required the use of an assistive device for ambulation but retained the use of the free hand for lifting and carrying; could occasionally climb ramps and stairs but needed to avoid climbing ropes, ladders or scaffolds; could occasionally balance, stoop and crouch but needed to avoid kneeling or crawling; and could have had occasional exposure to unprotected heights, moving mechanical parts, extreme temperatures, humidity, and vibration.
>
> 6. Through the date last insured, the claimant was capable of performing past relevant work as a customer complaint clerk (DOT #241.367-014, SVP 5, sedentary exertion as generally performed). This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).
>
> 7. The claimant was not under a disability, as defined in the Social Security Act, at any time from June 14, 2013, the alleged onset date, through December 31, 2013, the date last insured (20 CFR 404.1520(f)).
>
> (D.I. 10 at 21-27)

(D.I. 19 at 2-12 (emphases and some alterations in original)).

On October 15, 2021, Judge Fallon issued the Report recommending Plaintiff's motion for summary judgment be denied and that Defendant's cross-motion for summary judgment be granted. (D.I. 19). Plaintiff timely objected to the Report (D.I. 20) and Defendant responded (D.I. 23).

## II. LEGAL STANDARDS

The power vested in a federal magistrate judge varies depending on whether the issue to be decided is dispositive or non-dispositive. "Unlike a nondispositive motion (such as a discovery motion), a motion is dispositive if a decision on the motion would effectively determine a claim or defense of a party." *Equal Employment Opportunity Commission v. City of Long Branch*, 866 F.3d 93, 98-99 (3d Cir. 2017) (citations omitted). For reports and recommendations issued for dispositive motions, "a party may serve and file specific written objections to the proposed findings and recommendations" within fourteen days of the recommended disposition issuing and "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." FED. R. CIV. P. 72(b)(2)-(3); *see also* 28 U.S.C. §§ 636(b)(1)(B)-(C); *Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011). When no timely objection is filed (including as to select portions of the report), "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." FED. R. CIV. P. 72(b) advisory committee notes to 1983 amendment. "[B]ecause a district court must take some action for a report and recommendation to become a final order and because '[t]he authority and the responsibility to make an informed, final determination . . . remains with the judge,'" however, district courts are still obligated to apply "reasoned consideration" in such situations. *City of Long Branch*, 866 F.3d at 99-100 (citing *Mathews v. Weber*, 423 U.S. 261, 271 (1976); *see also Henderson v. Carlson*, 812 F.2d 874, 878 (3d Cir. 1987)).

## III. DISCUSSION

In the Report, Judge Fallon correctly determined that substantial evidence supports the ALJ's finding that Plaintiff could perform a range of sedentary work during the short six-month window between her alleged disability onset date and her date last insured. (D.I. 19 at 14-16). *See*

11

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (explaining that substantial evidence is an evidentiary threshold that is "not high" and requires only "more than a mere scintilla" of evidence). Judge Fallon discussed the ALJ's RFC assessment, noting the ALJ properly considered Plaintiff's subjective complaints of pain, relevant treatment records, and the medical opinions. (D.I. 19 at 15).  In particular, she discussed that the ALJ took into account evidence related to Plaintiff's limited mobility, but also considered treatment notes showing Plaintiff's increased range of motion and strength in the months following her meniscus surgery.  (*Id.* at 15-16).  Judge Fallon also correctly observed that the RFC accounted for Plaintiff's use of an assistive device for walking. (*Id.* at 15).  Additionally, Judge Fallon addressed the ALJ's finding that Plaintiff's allegations were not entirely consistent with the overall evidence in the record.  (D.I. 19 at 20).  She noted that the ALJ's decision to discount Plaintiff's subjective complaints was based on "consideration of the objective medical evidence and other evidence of record."  (*Id.* at 21).

This Court has reviewed de novo the issues addressed in the Report.  Having reviewed all of the evidence and keeping in mind the "not high" substantial evidence standard (*Biestek*, 139 S. Ct. at 1154) that requires a reviewing court to "defer[] to the presiding ALJ, who has seen the hearing up close"), the Court agrees with the recommendation of the Report.  The ALJ's decision is AFFIRMED.

## IV.  CONCLUSION

For the foregoing reasons, the Court overrules Plaintiff's objections, adopts the Report, denies Plaintiff's motion for summary judgment, and grants Defendant's cross-motion for summary judgment.

An appropriate order will follow.